**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PETER LEUNG, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:21-cv-10335-DJC |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | <u>CLASS ACTION</u> |
| BLUEBIRD BIO, INC., NICK LESCHLY, and CHIP BAIRD, | |
| Defendants. | |

Lead Plaintiff Jerry R. Hannah ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, including, among other things, reviewing the Defendants' public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding bluebird bio, Inc. ("bluebird" or "Company"), analysts' reports and advisories about the Company, and information readily obtainable. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased bluebird securities between May 11, 2020 and November 4, 2020, both dates inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      On November 4, 2020, after the close of markets, bluebird disclosed that it would postpone applying for U.S. Food and Drug Administration ("FDA") approval of its LentiGlobin treatment for sickle cell disease ("SCD") from the second half of 2021 to late 2022.

3.      Only six months earlier, Defendants had touted that the Company expected to submit to the FDA a U.S. Biologics Licensing Application ("BLA") for LentiGlobin for SCD, having reached "alignment" with the FDA on the clinical aspects of the BLA submission. The Company had projected the BLA submission for the second half of 2021, substantially accelerating the timeline for commercializing the potentially lucrative SCD treatment. On the heels of this announcement, bluebird sold 10.5 million shares of its stock in a secondary offering for proceeds of $541.5 million.

4.      In its November disclosure, however, bluebird cited FDA "feedback" requiring the Company to provide additional data from a comparability analysis using actual SCD patient cells "to demonstrate drug product comparability" in terms of drug potency. The comparability assessment the Company had planned to conduct contemplated using only healthy donor cells, and thus was not capable of demonstrating comparable potency. Accordingly, bluebird adjusted its BLA submission timing to late 2022.

5.      On this news, bluebird's stock price fell $9.72 per share, or 16.6%, to close at $48.83 per share on November 5, 2020.

6.      bluebird is a biotechnology company that develops gene therapies for severe genetic diseases and cancer. To date, it has commercialized only one product, Zynteglo, for sale in Europe. The Company's gene therapy programs include, among others, LentiGlobin for the treatment of sickle cell disease ("LentiGlobin for SCD").

7.      In May 2020, the beginning of the Class Period, Defendants announced that they learned from a meeting with the FDA that bluebird and the FDA had reached "alignment" with the FDA on bluebird's plan to submit its LentiGlobin for SCD clinical results as part of a BLA. The Company announced that it expected to submit a U.S. Biologics Licensing Application ("BLA") to the FDA for LentiGlobin for SCD in the second half of 2021 – substantially accelerating the timeline for commercialization of the potentially lucrative treatment. On the heels of this announcement, bluebird sold 10.5 million shares of its common stock for proceeds of $541.5 million.

8.      At the same time that bluebird announced its accelerated timeline for submitting the BLA for LentiGlobin for SCD, it was transitioning the manufacturing process for producing LentiGlobin for SCD. Whereas in bluebird's clinical trials it had used an adherent-based manufacturing process, it was transitioning to a suspension-based process, including for new patients enrolling in their clinical trials. The Company planned to commercialize LentiGlobin for SCD using the suspension-based manufacturing process because of its purported advantages in scalability.

9.      As Defendants were well-aware, to submit a viable BLA for LentiGlobin for SCD on the accelerated timeline, in addition to demonstrating adequate clinical results, it must also demonstrate to the FDA the adequacy of its chemistry, manufacturing, and controls ("CMC") for producing LentiGlobin for SCD. Defendants knew that one of the biggest hurdles they faced on the CMC side was demonstrating the comparability of (A) LentiGlobin for SCD as manufactured with the adhesion process, which they had used for their clinical trials through May 2020, and (B) LentiGlobin for SCD as manufactured with the suspension process, which they planned to use for commercial production.

10.     While Defendants repeatedly assured investors that they expected to file the BLA for LentiGlobin for SCD in the second half of 2021, and that they remained "on track" for this accelerated submission timeline, in truth they had no chance of doing so. In fact, unbeknownst to investors, the CMC plan that Defendants intended to and did submit to the FDA was obviously deficient.

11.     In touting the accelerated BLA submission timeline to investors, Defendants knew, or were severely reckless in not knowing, that bluebird needed to conduct a comparability analysis showing that the ***potency*** of LentiGlobin for SCD (*i.e.* its effectiveness at treating SCD) was maintained between the version of the drug product used in bluebird's clinical trials and the version it planned to use for commercial production. To demonstrate the therapy's effectiveness using the new, suspension manufacturing method, the FDA would require bluebird to test the therapy, using the suspension manufacturing method, on ***actual SCD patient cells***.

12.     Defendants, however, omitted in their public statements to investors that the comparability assessment that the Company planned to and did submit to the FDA entailed testing of only healthy donor cells, not SCD patient cells. This assessment could not possibly demonstrate the comparability of the drug product's potency using the new suspension process. Indeed, as Defendants knew, or were severely reckless in not knowing, bluebird would be unable to conduct and complete an adequate comparability assessment that could demonstrate drug potency using SCD patient cells in time to meet the "second half of 2021" timeline for BLA submission. Misleading the market, Defendants omitted these facts while raising over half a billion dollars from investors.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because many of the false and misleading statements were made in or issued from this District, and bluebird's U.S. offices are located within this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the U.S. securities markets.

## PARTIES

19.     Plaintiff, as set forth in his certification on file with the Court (Dkt. No. 18-2) and incorporated by reference herein, purchased bluebird securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant bluebird is a Delaware corporation with principal executive offices located at 60 Binney Street, Cambridge, Massachusetts 02142. bluebird common stock trades in an efficient market on the NASDAQ under the ticker symbol "BLUE."

21.     Defendant Nick Leschly ("Leschly") has served as bluebird's President, Chief Executive Officer, and a director of the Company since September 2010.

22.     Defendant Chip Baird ("Baird") has served as bluebird's Chief Financial Officer at all relevant times. Baird joined bluebird in February of 2019 as CFO.

23.     Defendants Leschly and Baird are sometimes referred to herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of bluebird's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of bluebird's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with bluebird, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     The Individual Defendants (a) directly participated in the management of the Company; (b) were directly involved in the day-to-day operations of the Company at the highest levels; (c) were privy to confidential proprietary information concerning the Company and its business and operations; (d) were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) were aware of or recklessly disregarded the fact that false and

misleading statements were being issued concerning the Company; and/or (g) approved or ratified these statements in violation of the federal securities laws.

26.     Together, bluebird and the Individual Defendants are "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Background

27.     bluebird is a biotechnology company that develops and commercializes gene therapies for severe genetic diseases and cancer. bluebird has developed gene therapies for a variety of indications based on the Company's lentiviral gene addition platform, gene editing and cancer immunotherapy capabilities.

28.     bluebird's programs in the severe genetic disease arena include betibeglogene autotemcel (beti-cel; formerly LentiGlobin for β-thalassemia); LentiGlobin for SCD (also referred to by bluebird as bb1111); and elivaldogene autotemcel (eli-cel; formerly Lenti-D for cerebral adrenoleukodystrophy, or CALD). bluebird's oncology programs include chimeric antigen receptor (CAR) and T cell receptor (TCR) T cell therapies. Idecabtagene vicleucel, or ide-cel, and bb21217 are CAR-T cell product candidates for the treatment of multiple myeloma, which bluebird developed in partnership with Bristol-Myers Squibb.

29.     According to bluebird its platform is based on lentiviral vectors which are used, in its severe genetic disease programs, to introduce a functional copy of a gene to the patient's own isolated hematopoietic stem cells ("HSCs"). In the context of gene therapy, lentiviral vectors are a method by which genes can be inserted, modified, or deleted in organisms using lentiviruses. Lentiviruses are a type of virus that infects an organism's cells by inserting DNA into their host cells' genome. HSCs are immature cells that can develop into all types of blood cells, including white blood cells, red blood cells, and platelets. HSCs are found in peripheral blood and bone marrow.

**LentiGlobin for SCD**

30.     bluebird designed LentiGlobin for SCD as a one-time treatment for patients with SCD. SCD is a hereditary red blood cell blood disorder resulting from a mutation in the β-globin gene that causes polymerization of hemoglobin, resulting in abnormal red blood cell function. Hemoglobin is a protein which transports oxygen from the lungs to the tissues. The disease is characterized by hemolytic anemia, vaso-occlusive events (repeated acute painful episodes of vaso-occlusion due to sickle cell crises, acute chest syndrome, priapism, or chronic organ damage), cumulative damage to multiple organs, infections, stroke, overall poor quality of life and early death in a large subset of patients.

31.     According to the Company, each year approximately 300,000 persons globally receive a diagnosis of SCD. According to bluebird, current SCD treatments are limited to chronic blood transfusions or hydroxyurea (a generic drug).

32.     According to bluebird, its approach in treating SCD involves the *ex vivo* (outside the patient's body) insertion of the normal β-globin gene with an amino acid substitution using a lentiviral vector into the patient's own HSCs. The goal is to deploy the vector into damaged cells to replace the mutated β-globin gene, enabling the cell to form normally functioning hemoglobin and normal red blood cells.

33.     In LentiGlobin for SCD, the amino acid substitution is used to quantify expression levels of the functional β-globin protein in patients, while also providing anti-sickling properties. The Company refers to the cells that have undergone this *ex vivo* manufacturing process, resulting in genetically modified HSCs, as LentiGlobin for SCD. As the Company noted in its annual report for 2019, filed on February 18, 2020 with the SEC on Form 10-K ("2019 10-K"): "In the treatment of severe genetic disease, the ultimate product of our manufacturing processes is the patient's own gene-modified cells, which we refer to as our drug product."

34.     If the FDA and European Medicines Agency (EMA) approve LentiGlobin for SCD, it could be a blockbuster therapy for bluebird. An analyst report from Oppenheimer & Co., dated November 4, 2020, projected peak global sales for LentiGlobin for SCD at $2.1 billion, more than double what Oppenheimer projected for any of bluebird's other four products in development, and nearly as much as all four other products combined.

35.     The Company conducted multiple clinical studies to evaluate the safety and efficacy of LentiGlobin for SCD in the treatment of patients with SCD. The Company's phase 1/2 clinical study for LentiGlobin for SCD was referred to as "HGB-206." According to bluebird's 2019 10-K, "[t]he HGB-206 study is a single-dose, open-label, non-randomized, multi-site phase 1/2 clinical study in the United States to evaluate the safety and efficacy of LentiGlobin for SCD. Approximately fifty adult and adolescent patients are enrolled in the study. … We refer to the 32 patients treated under the amended study protocol utilizing HSCs from peripheral blood after mobilization with plerixafor as patients in 'Group C.'"

36.     The Company's phase 3 clinical study for LentiGlobin for SCD was referred to as "HGB-210." According to bluebird's 2019 10-K, "HGB-210 is a single-dose, open-label, non-randomized, multi-site, international phase 3 clinical study to evaluate the efficacy and safety of LentiGlobin for SCD in the treatment of patients with SCD and a history of vaso-occlusive events, or VOEs, with a target enrollment of 35 pediatric, adolescent and adult patients."

37.     Prior to May 2020, bluebird's clinical studies for LentiGlobin for SCD used lentiviral vectors manufactured through an adherent process. The Company described the adherent manufacturing process in its 2019 10-K:

> Our lentiviral vectors are assembled using a human cell line called HEK293T. The HEK293T cells are maintained in disposable flasks until sufficient cell mass has been generated to fill approximately 40 ten tray cell factories, or TTCFs, then transferred and allowed to adhere to the bottom of the trays.  Adherent cells are transfected

with multiple plasmids encoding all the genetic material required to assemble the lentiviral vector carrying the functional gene of interest. The transfected HEK293T cells then assemble our lentiviral vectors packaged with the functional gene of interest, which bud off into the cell culture media. The media containing the assembled vectors is harvested, purified, concentrated and formulated prior to freezing for storage. These finished lentiviral vectors are what is ultimately used to transduce the targeted cells isolated from the patient.

We believe that our lentiviral platform has broad applicability, since the majority of the viral production system can remain the same, while we change only the therapeutic gene "cassette" depending on the disease. In other words, the vector "backbone" stays the same, while only the therapeutic gene and related sequences are changed. If we were to undertake drug development in an additional indication, we believe we could rapidly move forward using this lentiviral vector backbone and associated assays, simply by switching the therapeutic gene insert and associated control elements.

38.     In the 2019 10-K, the Company also described a new, suspension-based lentiviral vector manufacturing process:

Additionally, we have developed a proprietary cell-based vector manufacturing process that is both reproducible and scalable. Although we intend to continue manufacturing our Lenti-D vectors in TTCFs, we are adapting our LentiGlobin, ide-cel and bb21217 vector production technology to scalable production systems with the potential to produce sufficient quantities to treat an increased number of patients per manufacturing cycle, and we have demonstrated successful production of our LentiGlobin, ide-cel and bb21217 vectors at the scale we believe will support potential commercial demand. We intend to use a mix of internal and third-party manufacturing capabilities to accommodate future demand for our drug candidates, if approved, in their current indications as well as those beyond our initial focus.

39.     In the 2019 10-K, the Company also explained that it faced heated competition from other companies developing treatments for SCD, including multiple companies working on similar gene therapies:

Sickle cell disease: The current standard of care for the treatment of SCD in the developed world is chronic blood transfusions or hydroxyurea (a generic drug). In addition, patients treated with

10

chronic blood transfusions often receive iron chelation therapy to help manage the iron overload. Emmaus Life Sciences, Inc. received FDA approval for and have launched Endari (L-glutamine). We are aware of ongoing studies that continue to evaluate the efficacy and safety of hydroxyurea in various populations. In addition, a limited number of patients with SCD receive allogeneic HSCT treatment, particularly if a sufficiently well-matched source of donor cells is identified. In addition, there are a number of academic and industry-sponsored research and development programs to improve the tolerability and safety of allogeneic HSCT with less well-matched sources of donor cells, while increasing the availability of suitable donors. These programs include a modified donor T cell therapy to be used in conjunction with haploidentical HSCT that is in a phase 1/2 study supported by Bellicum Pharmaceuticals, Inc., though the program is currently on hold while the company identifies a partner. In addition to the recently approved hemoglobin S (HbS) polymerization inhibitor (voxelotor, Global Blood Therapeutics, Inc.) and the antibody to p-selectin (crizanlizumab, Novartis), a number of different therapeutic approaches are under investigation targeting the various aspects of SCD pathophysiology, including: guanylate cyclase stimulator and mediator of nitric oxide currently, Olinciguat, in a phase 2 study supported by Cyclerion, a pyruvate kinase receptor activator, mitapivat, in a phase 1 study supported by Agios Pharmaceuticals, Inc..; ***and also gene editing approaches being supported by Intellia Therapeutics, Inc. (in collaboration with Novartis), Editas Medicine, Inc. and CRISPR Therapeutics AG (in collaboration with Vertex Pharmaceuticals Incorporated); and Sangamo BioSciences Inc. (in collaboration with Bioverativ). There are also several different groups developing gene therapy approaches for SCD. Some of these groups use a similar* **ex vivo** *autologous approach, but make use of different vectors and different cell processing techniques. These include: UCLA, which has received funding from the California Institute of Regenerative Medicine to pursue a phase 1 gene therapy study for SCD; and Aruvant Sciences, Inc.'s ARU-1801, currently in a phase 1/2 gene therapy study for SCD.***

(Emphasis added).

40.     In light of the numerous competitors nipping at their heels in the market for SCD gene therapy treatments and other alternatives, bluebird's move to a suspension-based manufacturing process was an important part of the value proposition for LentiGlobin for SCD.

That became apparent when bluebird announced in May 2020 that it would be manufacturing LentiGlobin for SCD for commercial purposes using the suspension-based process.

41.     Indeed, Defendants and bluebird's executives underlined the importance of the suspension method in repeated public statements. On May 11, 2020, bluebird hosted a conference call with investors and analysts to discuss the Company's first quarter 2020 results ("1Q20 Conference Call"). During the 1Q20 Conference Call, Defendant Baird noted that bluebird's "core four" – which includes LentiGlobin for SCD – "doesn't happen without manufacturing and here we are … making the transition to suspension lentiviral vector manufacturing. ***This is critical from both a cost of goods perspective and a capacity perspective***."

42.     Later during the 1Q20 Conference Call, Baird described the impact bluebird expected the suspension manufacturing method to have on the Company's prospects.

> We haven't gotten into expectations setting on gross margins or things of that sort. But suffice it to say, suspension is a big boost on that front and it gets back to some of the commentary around financial sustainability, that's a key component of it, not just to be able to deliver curative therapies but at scale and on – yeah, that business model that gets us where we want to be. So, we're – top priority for us, it's getting suspension over the line.

43.     Defendants echoed this sentiment later in the Class Period. On August 5, 2020, after the close of markets, bluebird issued a press release announcing its second quarter 2020 financial results and recent operational progress ("2Q20 Press Release"). In the 2Q20 Press Release the Company explained that its suspension-based lentiviral vector manufacturing process "is intended to allow for larger scale and more efficient manufacturing of LVV."

44.     On November 4, 2020, after close of markets, bluebird hosted a conference call with investors and analysts to discuss the Company's third quarter 2020 results ("3Q20 Conference Call"). During the 3Q20 Conference Call, Defendant Leschly noted that "we're

really excited about the suspension product. And we actually think it's best of breed and also allows us to scale in a completely different way, so that's incredibly important." Later during the call, Leschly emphasized bluebird's focus "on the medium to long term" and "making sure that we can drive down cost of goods," noting that "the suspension product is critical in that regard." Derek Adams, bluebird's Chief Technology & Manufacturing Officer explained that "we need the suspension vector as a way to provide product to the size of the patient population that we're hoping to treat in for commercially viable costs of goods."

45.     Analysts were also keenly interested in how bluebird's suspension manufacturing process would affect the Company's timing advantage over competitors in the SCD treatment space. During the 3Q20 Conference Call, an analyst from RBC Capital Markets asked about data released that day "from CRISPR on sickle cell disease" and "how are you thinking at this point of your timing advantage versus them given the delay?"

### Regulation of Gene Therapy Products in the U.S.

46.     In the United States, gene therapy products and other biological products, are regulated by the FDA under the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act. These Acts and the corresponding regulations govern the testing, manufacturing, safety, efficacy, labeling, packaging, storage, record keeping, distribution, reporting, advertising and other promotional practices involving biological products such as LentiGlobin for SCD.

47.     FDA approval must be obtained before clinical testing of biological products, and each clinical study protocol for a gene therapy product is reviewed by the FDA. FDA approval also must be obtained before marketing and commercialization of biological products.

48.     According to bluebird's 2019 10-K, clinical studies of biological products are typically conducted in three sequential phases, which may overlap or be combined. In Phase 1, the biological product is typically introduced into healthy subjects and tested for safety. In Phase

2, the biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule. In Phase 3, clinical studies further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical study sites. These clinical studies are intended to establish the overall risk/benefit ratio of the product and provide an adequate basis for product labeling.

49.     After the completion of clinical studies, FDA approval of a BLA must be obtained before a company can engage in commercial marketing of a biological product. The BLA must include results of product development, laboratory and animal studies, human studies, information on the manufacture and composition of the product, proposed labeling and other relevant information.

50.     According to bluebird, the process required by the FDA to market a biological product in the United States generally involves:

- completion of nonclinical laboratory tests and animal studies according to good laboratory practices, or GLPs, and applicable requirements for the humane use of laboratory animals or other applicable regulations;

- submission to the FDA of an application for an IND, which must become effective before human clinical studies may begin;

- performance of adequate and well-controlled human clinical studies according to the FDA's regulations commonly referred to as good clinical practices, or GCPs, and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the proposed biological product for its intended use;

- submission to the FDA of a Biologics License Application, or BLA, for marketing approval that includes substantive evidence of safety, purity, and potency from results of nonclinical testing and clinical studies;

14

- satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced to assess compliance with GMP, to assure that the facilities, methods and controls are adequate to preserve the biological product's identity, strength, quality and purity and, if applicable, the FDA's current good tissue practices, or GTPs, for the use of human cellular and tissue products;

- potential FDA audit of the nonclinical and clinical study sites that generated the data in support of the BLA; and

- FDA review and approval, or licensure, of the BLA.

51.     Within the FDA, the Center for Biologics Evaluation and Research, ("CBER"), regulates gene therapy products. The FDA and the National Institutes of Health ("NIH") have published guidance documents with respect to the development and submission of gene therapy protocols. The FDA also has published guidance documents related to, among other things, gene therapy products in general, their preclinical assessment, observing subjects involved in gene therapy studies for delayed adverse events, potency testing, and chemistry, manufacturing and control information in gene therapy INDs.

52.     In January 2020, the FDA issued a final guidance document titled "Chemistry, Manufacturing, and Control (CMC) Information for Human Gene Therapy Investigational New Drug Applications (INDs) - Guidance for Industry." In the guidance document the FDA explained that "[t]he purpose of this guidance is to inform sponsors how to provide sufficient CMC information required to assure product safety, identity, quality, purity, and strength (including potency) of the investigational product (21 Code of Federal Regulations (CFR) 312.23(a)(7)(i)). This guidance applies to human gene therapy products and to combination products that contain a human gene therapy in combination with a drug or device." In the guidance, the FDA specifically stated:

### f. Manufacturing Process Development (3.2.S.2.6)

For early stage INDs, there may be differences between the manufacturing and testing of the toxicology lots and the material you plan to use in the clinical studies. For later stage INDs, there may be changes to the manufacturing process as part of process development, optimization, or under certain conditions there may be reprocessing step(s). In both situations, we recommend that you describe how manufacturing differences are expected to impact product safety and activity and to provide batch analysis information in the "Batch Analysis (3.2.S.4.4)" section of the CTD.

*If you make significant manufacturing changes, then comparability studies may be necessary to determine the impact of these changes on the identity, purity, potency, and safety of the product*. The extent of comparability testing would depend on the manufacturing change, the ability of analytical methods to detect changes in the product, and the stage of clinical development. For first-in-human studies, any differences between toxicology lots and clinical lots should be assessed for their impact on product safety. For later phase studies, especially those designed to measure product efficacy, differences in clinical lots should be assessed for their impact on product safety and activity.

(Emphasis added).

### Defendants Made False and Misleading Statements and Omissions of Material Fact Regarding the Company's Plan for Submitting a BLA for LentiGlobin for SCD

53.     In May 2020, bluebird announced that the Company expected to submit a BLA to the FDA for LentiGlobin for SCD in the second half of 2021.

54.     On May 11, 2020, bluebird issued a press release providing an operational and business update and reporting its first quarter 2020 financial results ("1Q20 Press Release"). The 1Q20 Press Release touted bluebird's accelerated timeline for submitting a BLA for LentiGlobin for SCD, stating that bluebird had "general agreement with FDA that the clinical data package required to support a BLA submission for LentiGlobin™ for sickle cell disease (SCD) will be based on data from a portion of patients in the HGB-206 study Group C that have already been treated."

55.     The 1Q20 Press Release also stated that "The company is planning to seek an accelerated approval and expects to submit the U.S. Biologics Licensing Application (BLA) for sickle cell disease in the second half of 2021," despite acknowledging that bluebird "anticipates additional guidance from FDA regarding the commercial manufacturing process, including suspension lentiviral vector."

56.     This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) the "additional guidance" bluebird received from the FDA regarding the commercial manufacturing process would necessarily reflect the need to conduct this potency comparability analysis; (3) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (4) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

57.     The 1Q20 Press Release also quoted Defendant Leschly, who stated that "we have alignment with FDA on our clinical data package and filing path for LentiGlobin for sickle cell disease, which accelerates our planned base case filing timeline into 2021"; and that bluebird has "prioritized our core four programs [including LentiGlobin for SCD] to drive … filings in 2021."

58.     These statements were false and misleading because Defendants knew, or were severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in

SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) in fact bluebird had reached alignment with the FDA on an accelerated BLA filing timeline only as to the *clinical* aspects of the BLA, but had received no confirmation of alignment with the FDA on an accelerated filing timeline as to the *CMC* aspects of the BLA; (3) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (4) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

59.     Also on May 11, 2020, bluebird hosted the 1Q20 Conference Call. In his prepared remarks on that call, Defendant Leschly represented that "[o]n the sickle cell disease front, we're happy to share that we have reached general alignment with the FDA on an accelerated approval path for LentiGlobin in sickle cell disease with plans to file for approval in the second half of 2021," and that, "[o]verall, 2021 is on track to deliver several major milestones, including … the US filing[] of … LentiGlobin in sickle cell."

60.     These statements were false and misleading because Defendants knew, or were severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) in fact bluebird had reached alignment with the FDA on an accelerated BLA filing timeline only as to the *clinical* aspect of the BLA, but had received no confirmation of alignment with the FDA on an accelerated filing timeline as to the *CMC* aspects of the BLA; (3) bluebird's plan for

conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (4) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

61.     Later in the same conference call, an analyst from William Blair asked: "On the adherent [] versus suspension manufacturing process, can you just kind of give us a sense of how that aligns with the current filings with the regulatory agencies?" In response, Leschly explained that "HGB-206 and HGB-210 as they continue to enroll patients will be doing so with the suspension product," describing this development as "a very positive thing obviously," and noting that "we don't anticipate that standing in the way" of the accelerated BLA submission.

62.     These statements were false and misleading because Defendants knew, or were severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (3) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

63.     That same day, bluebird filed a quarterly report for the first quarter of 2020 with the SEC on Form 10-Q ("1Q20 10-Q"). The 1Q20 10-Q stated that:

> Based on our discussions with the FDA, we believe that we may be
> able to seek accelerated approval for LentiGlobin for SCD in the
> United States on the basis of clinical data from Group C of our
> ongoing HGB-206 clinical study, with a potential first submission
> in the second half of 2021, and with our ongoing HGB-210 clinical
> study providing confirmatory data for full approval.

64.     This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in actual patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) in fact bluebird had reached alignment with the FDA on an accelerated BLA filing timeline only as to the *clinical* aspect of the BLA, but had received no confirmation of alignment with the FDA on an accelerated filing timeline as to the *CMC* aspects of the BLA; (3) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (4) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

65.     The 1Q20 10-Q also contained false and misleading statements and omissions in its disclosure of Risk Factors. Specifically, the 1Q20 10-Q stated in its Risk Factors section that:

> **Risks related to the research and development of our product
> candidates**
>
> ***We cannot predict when or if we will obtain marketing approval
> to commercialize our product candidates, and the marketing
> approval of our product and any future products may ultimately
> be for more narrow indications than we expect.***
>
> ***

> …if we make manufacturing or formulation changes to our product
> or product candidates, we may need to conduct additional studies
> to demonstrate comparability of the modified versions to earlier
> versions. For instance, we are transitioning the production process
> of our lentiviral vectors used in the manufacture of our drug
> products from an adherent cell tray process to a scalable
> suspension process.

(Emphasis in original).

66.     This statement was misleading because Defendants had already conferred with the FDA and knew, or were severely reckless in not knowing, but omitted that (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird transitioned to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (3) bluebird would need to conduct an additional comparability assessment capable of demonstrating comparable potency in SCD patient cells. Thus, this risk had already materialized with respect to LentiGlobin for SCD and bluebird's stated timeline for its BLA submission.

67.     Appended as an exhibit to the 1Q20 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by the Individual Defendants, wherein the Individual Defendants certified that the 1Q20 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company."

68.     These statements were false and misleading because the 1Q20 10-Q did contain untrue and misleading statements of material fact as outlined in ¶¶ 63-66 above. Accordingly, the information contained in the 1Q20 10-Q did not fairly present the financial condition and results of operations of the Company.

69.     Following these statements touting bluebird's accelerated timeline for filing the BLA for LentiGlobing for SCD, purportedly in "alignment" with the FDA, the Company's share closed at $60.23 on May 11, 2020, an increase of $0.95 over the prior day, on unusually high trading volume.

**The Company Raised Over $500 Million on the Heels of Its Accelerated BLA Submission Timeline Announcement, Reiterating Its False and Misleading Statements and Omissions**

70.     Defendants' false and misleading statements and omissions artificially inflated the Company's stock price during the Class Period. This helped Defendants raise critical capital through selling the Company's common stock at a higher price than they would otherwise be able to obtain absent the artificial inflation.

71.     In its 1Q20 10-Q, bluebird reported that "[t]he Company has incurred losses since inception and to date has financed its operations primarily through the sale of shares of the Company's stock." Continuing, the 1Q20 10-Q stated that "[t]he Company expects to continue to generate operating losses and negative operating cash flows for the next few years and will need additional funding to support its planned operating activities through profitability."

72.     The 1Q20 10-Q reported that bluebird's net loss from operations for the quarter was just over $200 million, after burning through approximately $206 million in net cash from operating activities in that quarter alone.

73.     On May 18, 2020, bluebird announced a public offering of 9,090,910 shares of the Company's common stock at a price to the public of $55.00 per share. The Company also

granted the underwriters of the offering a 30-day option to purchase up to an additional 1,363,636 shares.

74.    The offering was made pursuant to the Company's effective shelf registration statement, including the prospectus dated February 18, 2020, as supplemented by a prospectus supplement. The Company filed the preliminary prospectus supplement on May 18, 2020, before markets opened. The Company filed the final prospectus supplement on May 19, 2020, after close of trading. The Company's share price rose $0.48 on May 18, 2020 to close at $57.14, on unusually high trading volume. It rose another $7.27 per share on May 20, 2020 to close at $65.17, on unusually high trading volume.

75.    According to bluebird's quarterly report for the second quarter of 2020, filed with the SEC on August 5, 2020 on Form 10-Q ("2Q20 10-Q"), bluebird successfully sold a total of 10.5 million shares of common stock through the public offering at $55.00 per share "for aggregate net proceeds of $541.5 million."

76.    Both the preliminary prospectus supplement and the final prospectus supplement echoed the same false and misleading claim Defendants made in their 1Q20 Press Release, the 1Q20 10-Q and the 1Q20 Conference Call. Indeed, the prospectus supplement also explicitly incorporated by reference the 1Q20 10-Q. Accordingly, the prospectus supplement incorporated by reference each of the false and misleading statements and omissions contained in the 1Q20 10-Q as alleged above.

77.    The prospectus supplement also stated that "[w]e are planning to seek an accelerated approval [for LentiGlobin for SCD] and expect to submit the BLA for sickle cell disease in the second half of 2021."

78.    This statement was false and misleading because Defendants knew, or were severely reckless in not knowing, but failed to disclose that: (1) the comparability analysis that

bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (3) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

79.     This capital raise was critical to the Company, which was reliant on outside financing to fund its operations. In fact, according to its annual reports for 2020 and 2019, bluebird had net losses from operations of $619 million in 2020 and $790 million in 2019.

### Defendants Continued to Make False and Misleading Statements and Omissions of Material Fact Regarding Their Plan for BLA Submission

80.     On August 5, 2020, after the close of markets, bluebird issued the 2Q20 Press Release. The 2Q20 Press Release touted that bluebird had "treated the first sickle cell patient with drug product manufactured with suspension-based lentiviral vector (sLVV)," and that "[t]he company intends to submit data supporting the use of sLVV to the FDA as part of its submission for regulatory approval of LentiGlobin™ gene therapy for SCD in the second half of 2021." The 2Q20 Press Release later reiterated that "[t]he company continues to plan to submit the U.S. BLA for SCD in the second half of 2021."

81.     These statements were false and misleading because Defendants knew, or were severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2)

bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus the data bluebird planned to submit to the FDA could not demonstrate that potency was maintained with the suspension process; and (3) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline.

82.     The 2Q20 Press Release also noted "the risk that our plans for submitting a BLA for LentiGlobin for SCD may be delayed if the FDA does not accept our comparability plans for the use of the suspension manufacturing process for LVV."

83.     This statement was misleading because Defendants already knew, or were severely reckless in not knowing, but omitted that (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird transitioned to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) bluebird's "comparability plans" did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (3) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline. Accordingly, the risk that bluebird's plans for submitting a BLA for LentiGlobin for SCD "may" be delayed had, in fact, already materialized.

84.     Also on August 5, 2020, after the close of markets, bluebird filed the 2Q20 10-Q. The 2Q20 10-Q stated:

> Based on our discussions with the FDA, we believe that we may be able to seek accelerated approval for LentiGlobin for SCD in the United States on the basis of clinical data from Group C of our

> ongoing HGB-206 clinical study, with a potential first submission
> in the second half of 2021, and with our ongoing HGB-210 clinical
> study providing confirmatory data for full approval.

85.     This statement was false and misleading because Defendants knew, or were
severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird
needed to complete and submit to the FDA had to demonstrate the potency of the drug product in
actual patient cells was maintained when bluebird changed to the suspension-based
manufacturing process that bluebird intended to use for commercial production of LentiGlobin
for SCD; (2) in fact bluebird had reached alignment with the FDA on an accelerated BLA filing
timeline only as to the *clinical* aspects of the BLA, but had received no confirmation of
alignment with the FDA on an accelerated filing timeline as to the *CMC* aspects of the BLA; (3)
bluebird's plan for conducting a comparability assessment did not involve testing SCD patient
cells and thus could not demonstrate that potency was maintained with the suspension process;
and (4) bluebird could not complete the comparability analysis using patient cells in time to
submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to
believe that bluebird could submit the BLA on that timeline.

86.     The 2Q20 10-Q also stated that:

> Given the ongoing impact of the COVID-19 global pandemic and
> recent shifts in regulatory timelines, in the first half of 2020 we
> completed a comprehensive business review with the goal of
> ensuring the ability to achieve our 2022 vision with a path towards
> financial sustainability. Under our revised business priorities and
> operating plan, ***we remain on track for potential regulatory***
> ***approval and commercial launch for … LentiGlobin for SCD by***
> ***2022.***

(Emphasis added).

87.     This statement was false and misleading because Defendants knew, or were
severely reckless in not knowing, but omitted that: (1) the comparability analysis that bluebird
needed to complete and submit to the FDA had to demonstrate the potency of the drug product in

SCD patient cells was maintained when bluebird changed to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) bluebird's plan for conducting a comparability assessment did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (3) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline – a prerequisite for being "on track for potential regulatory approval and commercial launch" for LentiGlobin for SCD by 2022.

88.     The 2Q20 10-Q also contained false and misleading statements and omissions in its disclosure of Risk Factors. Specifically, the 2Q20 10-Q stated in its Risk Factors section that:

> ***We cannot predict when or if we will obtain marketing approval to commercialize our product candidates, and the marketing approval of our product and any future products may ultimately be for more narrow indications than we expect. If our product candidates are not approved in a timely manner or at all for any reason, our business prospects, results of operations, and financial condition would be adversely affected.***
>
> ***
>
> Based on our discussions with the FDA, we believe that we may be able to seek accelerated approval for our LentiGlobin for SCD product candidate in the United States on the basis of clinical data from Group C of our ongoing HGB-206 clinical study, with a potential first submission in the second half of 2021, and with our ongoing HGB-210 clinical study providing confirmatory data for full approval. … The FDA may not agree with our plans for demonstrating comparability of the adherent manufacturing process to the suspension manufacturing for lentiviral vector, which may result in delays in our ability to submit a BLA for regulatory approval of LentiGlobin for SCD.

(Emphasis in original).

89.     Similarly, later in the Risk Factors section, the 2Q20 10-Q stated that:

> ***Changes in our manufacturing processes may cause delays in our clinical development and commercialization plans.***

> The manufacturing processes for our lentiviral vectors and our drug products are complex. We explore improvements to our manufacturing processes on a continual basis, as we evaluate clinical and manufacturing data and based on discussions with regulatory authorities. In some circumstances, changes in the manufacturing process may require us to perform additional comparability studies, collect additional data from patients, submit additional regulatory filings, or comply with additional requirements, which may lead to delays in our clinical development and commercialization plans. … In LentiGlobin for SCD, we plan to seek regulatory approval for drug product utilizing lentiviral vector manufactured using the scalable suspension manufacturing process, rather than the adherent manufacturing process. The FDA … may not agree with our proposed plans for demonstrating the comparability of the two processes, and may require us to conduct additional studies, collect additional data, develop additional assays, or modify release specifications, which may delay our ability to submit a BLA … for regulatory approval of LentiGlobin for SCD.

(Emphasis in original).

90.     These risk factor statements were misleading because Defendants already knew, or were severely reckless in not knowing, but omitted that (1) the comparability analysis that bluebird needed to complete and submit to the FDA had to demonstrate the potency of the drug product in SCD patient cells was maintained when bluebird transitioned to the suspension-based manufacturing process that bluebird intended to use for commercial production of LentiGlobin for SCD; (2) bluebird's "plans for demonstrating comparability" did not involve testing SCD patient cells and thus could not demonstrate that potency was maintained with the suspension process; and (3) bluebird could not complete the comparability analysis using patient cells in time to submit a BLA for LentiGlobin for SCD in 2021, therefore Defendants had no reasonable basis to believe that bluebird could submit the BLA on that timeline. Accordingly, the risk that bluebird's plans for submitting a BLA for LentiGlobin for SCD "may" be delayed had, in fact, already materialized.

91.     Appended as an exhibit to the 2Q20 10-Q were SOX certifications signed by the Individual Defendants, wherein the Individual Defendants certified that the 2Q20 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company."

92.     These statements were false and misleading because the 1Q20 10-Q did contain untrue and misleading statements of material fact as outlined in ¶¶ 84-90 above, and accordingly, the information contained in the 1Q20 10-Q did not fairly present the financial condition and results of operations of the Company.

93.     Following these statements reiterating bluebird's 2021 timeline for filing the BLA for LentiGlobing for SCD, the Company's share closed at $63.84 on August 6, 2020, an increase of $1.78 over the prior day, on unusually high trading volume.

**ADDITIONAL ALLEGATIONS PROBATIVE OF SCIENTER**

**bluebird's Prior Regulatory Stumbles Relating to CMC Issues**

94.     bluebird previously sought approval for other forms of the LentiGlobin treatment for difference indications. On more than once occasion, the Company ran into regulatory concerns with commercialization and manufacturing aspects of a submission, delaying the approval process. By the time bluebird was planning and discussing its BLA submission for LentiGlobin for SCD with the FDA's CMC arm, it had ample experience in the field and no excuse for failing to account for the level of scrutiny and obvious concerns the FDA would have with its CMC processes.

95.     In June 2019, the Company obtained conditional marketing approval from the European Commission for beti-cel (formerly known as LentiGlobin for β-thalassemia and marketed in the EU as Zynteglo) as a treatment for certain patients with transfusion-dependent β-thalassemia, or TDT. However, that approval was plagued by manufacturing issues that delayed the product launch by several months. The Company also postponed the commercial launch of Zynteglo until the beginning of 2020 to finalize commercial specifications.

96.     The Company manufactures its only commercialized product, Zynteglo, using the same lentiviral vector used in LentiGlobin gene therapy for SCD. When bluebird suspended its LentiGlobin for SCD studies in early 2021 due to one of its test patients reporting an unexpected serious adverse reaction, it also suspended marketing of Zynteglo pending review of the report due to the similarities of the treatments.

97.     The Company also had already delayed its plan to seek US approval of LentiGlobin for β-thalassemia until mid-2021 after failing to reach an agreement with the FDA on the need for additional data involving "release assays."

**bluebird Suffers a Wave of Defections from Key CMC Personnel**

98.     FE1 worked at bluebird as a Logistics Specialist II – Global Supply Chain, from June 2019 until August 2020. According to FE1, Andreas Kouri, Bluebird Bio Head of Supply Chain Organization, left the company in August 2020. Kouri had worked at the company for about 10 years.

99.     FE2 worked as bluebird's Senior Director of People and Culture from July 2020 until March 2021. According to FE2, bluebird experienced an unusually high level of turnover among key personnel in 2020. FE3, bluebird's Senior Vice President of Business Strategy and Operations for the Company's Severe Genetic Diseases arm, left the Company in October 2020, to the surprise of many of FE3's colleagues. Allison Finger, bluebird's Chief Commercial

Officer, also left the Company in January 2021. Joanne Smith-Farrell, bluebird's Chief Operating Officer and Business Unit Head/Chief Business Officer and Oncology Franchise Leader, left bluebird in February 2021.

100.    FE2 noted that many employees felt concern over "all of these key people leaving," and viewed the departures as "very significant." This wave of unexplained departures continued with David Davidson, the Company's Chief Medical Officer, leaving bluebird in March 2021.

101.    According to FE2, Derek Adams oversaw CMC issues for the Company. FE2 also believed that Leschly was involved in decision-making concerning the BLA submission process.

102.    FE3 served as bluebird's Senior Vice President of Business Strategy and Operations: Severe Genetic Diseases, from August 2020 until October 2020. FE3 previously worked for two years as bluebird's Vice President and Franchise Lead: Severe Genetic Diseases, and prior to that served as bluebird's Senior Director and Program Lead: Adrenoleukodystrophy and the Director of Medical Affairs. FE3 reported that Derek Adams was responsible for overseeing the manufacturing and quality control components of LentiGlobin for SCD and other bluebird products.

## BLUBIRD REVEALS IT CANNOT MAINTAIN THE ACCELERATED TIMELINE FOR BLA SUBMISSION

103.    On November 4, 2020, after the close of trading, bluebird issued a press release announcing its third quarter 2020 financial results and highlighting operational progress ("3Q20 Press Release"). In the press release, the Company revealed that it would no longer apply for FDA approval of its LentiGlobin product as a treatment for SCD in the second half of 2021 as it previously had claimed. Instead, citing "feedback" from the FDA requiring the Company to provide additional data "to demonstrate drug product comparability" for LentiGlobin for SCD,

bluebird adjusted its submission timing to late 2022. Specifically, the 3Q20 Press Release stated,

in relevant part:

> bluebird bio is also announcing today that it has reached general agreement with FDA on its path to transition to commercial manufacturing using an analytical comparability strategy, including suspension-based lentiviral vector (sLVV). These developments meaningfully de-risk the bb1111 program and bring clarity on the path to approval. However, *FDA requested the use of drug product manufactured from sickle cell disease (SCD) patient cells in addition to healthy donors as well as commercial lentiviral vector to demonstrate drug product comparability. Given this feedback, alongside COVID-19 related shifts and contract manufacturing organization COVID-19 impacts, bluebird is adjusting its submission timing to late 2022.*

(Emphasis added).

104.    On the same date, after close of markets, bluebird hosted the 3Q20 Conference

Call. On the 3Q20 Conference Call, Leschley expanded upon the press release:

> We recently had a productive type B meeting with the FDA and reached alignment on our CMC submission plans. … On the CMC front, we reached general agreement with the FDA on the expectations for the future BLA analytical package, which will need to demonstrate continued analytical comparability of our drug product and lentiviral vector as we transition from clinical production to commercial manufacturing. …
>
> *While this interaction with the FDA confirmed the robustness of our clinical data package and overall CMC confidence, the requirements to demonstrate comparability are traditional and different than the plan we proposed and expected. First, comparability will now include not only a small number of drug product lots manufactured from healthy donors but also patients with sickle cell disease.* The lots to be manufactured with patient cells to support this analytical comparability package will be manufactured within the HGB-210 study and are in addition to the patients already treated with the drug product manufactured with suspension lentivirus. Second, at this time, the FDA is requiring that we use commercial vector versus comparable clinical vector to demonstrate the comparability of our commercial drug product. *Taking this together, both the new CMC requirements from the agency and the COVID-based CMO operational delays, we are adjusting the timing of the BLA submission back to the more conservative initial target timing of late 2022.*

(Emphasis added).

105.    During the question-and-answer portion of the 3Q20 Conference Call, an analyst from JPMorgan asked for "more detail or explain the rationale for why FDA wants to see comparability data with cells from sickle cell disease patients; and I guess, your view on how these might differ to healthy cells from a drug product manufacturing perspective." bluebird's Chief Medical Officer, David Davidson, and bluebird's Chief Technology and Manufacturing Officer, Derek Adams, responded to this inquiry as follows:

> **Davidson**: In the past, we have used healthy donor cells in terms of demonstrating comparability. The -- from the FDA perspective, you could appreciate that *patients with sickle cell disease do have a genetic disease, so there's certainly interest in understanding how those specific stem cells might behave in a way that could theoretically be different from normal healthy volunteer cells, although as Nick suggested, our hope had been that normal volunteer cells would be acceptable* given the robustness of the clinical data we're seeing, so far, and now that we're introducing, of course, our clinical vector into -- a suspension vector into the clinic in the 206 trial.

> **Adams**: The presumption, I guess, would be that the healthy donor cells, *the more healthy cells clearly don't allow us to be able to check the actual resulting potency of the drug product.* We are in fact looking at potency in the treated patients that we're doing now. And so as part of the comparability exercise, I want to presume that they are concerned about the potency, checking the potency of the results in drug product. It's part of comparability. And we'll continue to generate more data and we'll continue to have more conversations on how relevant that is with the agency as we get more data.

(Emphasis added).

106.    Following the 3Q20 Press Release and the 3Q20 Conference Call, various analysts covering the Company more clearly explained what the FDA was requiring of bluebird with respect to its LentiGlobin for SCD BLA submission. As an analyst report dated November 4, 2020 from Guggenheim Securities, LLC explained:

FDA requested the use of drug product manufactured from sickle cell disease (SCD) patient cells in addition to healthy donors as well as commercial lentiviral vector made using a new suspension-based manufacturing process to demonstrate drug product comparability vs. that generated using the clinical scale process which included the more cost-intensive adherent lentiviral vector manufacturing technique.

107.    Whereas bluebird had been using the adherent lentiviral vector manufacturing process in its clinical studies, including the HGB-206 Group C cohort, which provided the clinical data supporting bluebird's purported accelerated 2021 timeline for submitting the BLA for LentiGlobin for SCD. However, as the Company disclosed in May 2020, it had started to transition to a suspension lentiviral vector process in its clinical trials, including for new patients enrolling in the HGB-206 and HGB-210 trials. The Company planned to use the sLVV process to produce LentiGlobin for SCD for commercial purposes due to its advantages in scalability over the adherent method.

108.    In other words, the FDA required bluebird to demonstrate the comparability of LentiGlobin for SCD as manufactured through the adherent process with LentiGlobin for SCD as manufactured through the sLVV process. That was the comparability assessment requirement that bluebird alluded to in its Class Period filings – for which bluebird purported to have a "plan." However, as Defendants knew, or were severely reckless in not knowing, the FDA would and in fact did require that bluebird include in its comparability assessment drug product made from actual SCD patient cells in order to show the drug product maintained its potency under the new manufacturing method.

109.    The CMC "plan" that bluebird submitted to the FDA entailed using only healthy donor cells to attempt to demonstrate comparability between the lentiviral vector manufacturing methods. As Defendants knew, or were severely reckless in not knowing, attempting to conduct a comparability assessment without using actual SCD patient cells, with the characteristic SCD

genetic mutation, "clearly [didn't] allow us to be able to check the actual resulting potency of the drug product."

110.     As bluebird disclosed in the 3Q20 Press Release, to complete the comparability study in a way that could actually demonstrate that the potency of the LentiGlobin for SCD drug product was maintained when using the sLVV manufacturing process, it would need to manufacture drug product from patient cells that it would need to collect from its new HGB-210 clinical trial participants who were using the sLVV process.

111.     An analyst from Piper Sandler referred to these FDA requirements as a "curve ball," and described the requirements as "a specific set of CMC modules [that] need to be satisfied, which were unanticipated by management." The Piper Sandler analyst also explained the mechanics behind the delay:

> While not time consuming on its own, the commercial CMO [contract manufacturing organization] the company bluebird is using is experiencing 4-6 months delays due to COVID-19. Based on the need to have this CMO manufacture drug product for analytical comparability, the total delay is anticipated to be ~1 year (4-6 month delay from CMO, plus 6 months for CMC module execution). Thus, based on these developments, bluebird has shifted its BLA filing guidance from late 2021 to late 2022.

(Emphasis in original).

112.     On the news that bluebird would have to push back its BLA submission for LentiGlobin for SCD a full year, bluebird's stock price fell $9.72 per share, or 16.6%, to close at $48.83 per share on November 5, 2020.

113.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

## NO SAFE HARBOR

114.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein. None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

115.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by a director and/or executive officer of the Company who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

116.    None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired bluebird securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

118.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, bluebird securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by bluebird or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

119.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

120.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

121.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants' acts as alleged violated the Exchange Act;

(b)     Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the business, operations and management of bluebird;

(c)     Whether the Individual Defendants caused bluebird to issue false and misleading statements during the Class Period;

(d)     Whether Defendants acted knowingly or recklessly in issuing false and misleading statements during the Class Period;

(e)     Whether the prices of bluebird securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

122.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

123.     Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's common stock traded in an efficient market during the Class Period, in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)    The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d)    The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 4.8 million shares of the Company's common stock, or roughly 7% of the Company's total shares outstanding, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

(e)    The Company traded on the NASDAQ and was covered by multiple analysts;

(f)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(g)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities.

124.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

125.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

126.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

127.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

128.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above,

which they knew or deliberately disregarded were false and/or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

129.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

130.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of bluebird were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding bluebird, their control over and/or receipt of and/or modification of bluebird's materially false and misleading statements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning bluebird, participated in the fraudulent scheme alleged herein.

131.    The Individual Defendants, who are senior officers and/or directors of the Company, acted with reckless disregard for the truth when they failed to disclose the true facts in the statements made by them and the Company to members of the investing public, including Plaintiff and the Class.

132.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the integrity of the market price of the

Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

133.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

134.    By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a of the Exchange Act Against the Individual Defendants)**

135.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136.    During the Class Period, the Individual Defendants participated in the operation and management of bluebird, and conducted and participated, directly and indirectly, in the conduct of bluebird's business affairs.

137.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to bluebird's financial condition and results of operations, and to correct promptly any public statements issued by bluebird which had become materially false or misleading.

138.    Because of their positions of control and authority as senior officers and/or directors of the Company, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which bluebird disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause bluebird to engage in the wrongful acts complained

of herein. Therefore, the Individual Defendants were "controlling persons" of bluebird within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of bluebird securities during the Class Period.

139.    Each of the Individual Defendants acted as a controlling person of bluebird. By reason of their senior management positions and/or being directors of bluebird, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, bluebird to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of bluebird and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

140.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by bluebird.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2021                    **THE ROSEN LAW FIRM, P.A.**

*/s/ Joshua Baker*
Joshua Baker (BBO #695561)
Jacob A. Goldberg (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19047
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com
Email: jgoldberg@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2021, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Joshua Baker
Joshua Baker